UNITED STATES of America

v.

Earl STOUT.

Crim. No. 89–317–1.

United States District Court,
E.D. Pennsylvania.

Oct. 11, 1989.

Seth Weber, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Pamela W. Higgins, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

On August 15, 1989, the defendant, Earl Stout, was charged with one count of racketeering, one count of conspiracy to commit theft from programs receiving federal funds, thirteen counts of theft from programs receiving federal funds, and thirty-three counts of mail fraud. Stout's [1] attorney, Richard A. Sprague, Esquire, entered his appearance on behalf of the defendant on August 24, 1989. The following day, the government filed a motion for a hearing to determine whether Sprague's representation of Stout creates an unavoidable conflict of interest requiring his disqualification from this case. Hearings were held on Thursday, September 7, 1989, and Thursday, September 14, 1989, at which time the government made an oral motion for Sprague's disqualification. Both the government and the defendant presented documentary evidence and testimony to support their positions. For the reasons

---

1. Both Earl Stout and his son, William Stout, are defendants in this case. Unless otherwise noted, all references to "Stout" are to the defendant Earl Stout.

that follow, I find that the government's motion must be granted and that Sprague and the members of his law firm, Sprague, Higgins, Creamer & Sprague, must be barred from further participation in this case.

I will begin with a summary of the facts relevant to the government's motion, most of which are undisputed. I will then discuss the legal basis for my decision.

## I. FACTS

The defendant is a former president of District Council 33 of the American Federation of State, County and Municipal Employees, AFL–CIO ("District Council 33" or "the union"), as well as the chairman of the board of trustees of the District Council 33 Legal Services Fund and the District Council 33 Health and Welfare Fund, employee benefit funds managed by the union. He is also the former acting executive director and president of the John F. Kennedy Memorial Hospital ("JFK Hospital"), a nonprofit corporation administered by the board of trustees of the Health and Welfare Fund. The defendant served in these capacities for over thirteen years until May 10, 1988, when he was defeated in a bid for re-election.

Also charged in the indictment are the defendant's son, William C. Stout, the former assistant to the president of JFK Hospital; Cynthia Bullock, the former director of the District Council 33 Legal Service Plan; and Frances Rooney, the former vice-president of District Council 33. Specifically, the indictment charges that Stout used his "position and influence" within the union to direct the withdrawal of union funds totalling nearly one million dollars without the consent or authorization of the appropriate union officials. He is accused of fraudulently misappropriating and converting these funds to purchase various luxury items and generally to benefit himself and others.

Sprague represented the union, its members, and its affiliated entities, including its employee benefit funds, its boards of trustees, and JFK Hospital, in a wide variety of matters between 1979 and 1988. According to the defendant, "[Sprague's] law firm represented the [JFK] [H]ospital in several medical malpractice actions, represented union members in criminal cases, represented certain entities in defamation actions and in suits against the City of Philadelphia regarding benefits and pensions." Dft's Response to Govt's Supplemental Motion for Hearing at 1–2. In a letter of January 5, 1983, Sprague's law firm confirmed its agreement with Stout "to act as general counsel" to District Council 33 upon receipt of a non-refundable $75,000 retainer. Gov't Exh. 21.

In January of 1983, Sprague initiated an action against the City of Philadelphia on behalf of District Council 33 and its Health and Welfare Fund seeking monetary and injunctive relief on the grounds that the city had breached and was continuing to breach its collective bargaining agreement with the union by underpaying the union's Health and Welfare Plan from July 1, 1982, through June 30, 1984. *See District Council 33, et al. v. City of Philadelphia,* No. 3504, Philadelphia Court of Common Pleas, January Term 1983, No. 3504. The union claimed that the city had failed to make full payments for health and medical benefits for union members and their dependents pursuant to the agreement. Sprague decided to use the contractual period between July 1, 1982, and June 30, 1984, as a "test case," believing the city had breached similar contractual provisions in collective bargaining agreements dating back to 1975. If the union was successful in its test case, the hope was that this judgment would preclude the city from contesting liability as to the previous years. In May of 1985 and in June of 1986, the union filed companion lawsuits against the city concerning the contract periods between 1975 and 1982. *See District Council 33, et al. v. City of Philadelphia,* No. 4134, May Term 1985, Philadelphia Court of Common Pleas; *District Council 33, et al. v. City of Philadelphia,* No. 5932, June Term 1986, Philadelphia Court of Common Pleas.

In December of 1983, the Supreme Court of Pennsylvania reversed a decision by the court of common pleas and ordered that

Sprague's law firm be disqualified from representing the union in its case against the city. *City of Philadelphia v. District Council 33, et al.*, 503 Pa. 498, 469 A.2d 1051 (1983). Hillel S. Levinson, Esquire, a member of the Sprague firm when the union sued the city, had been the city's managing director from 1972 to 1980. During that time, the union's collective bargaining agreement with the city was negotiated and executed. Levinson had been actively involved in the negotiation process and had signed the 1975–1976 agreement on behalf of the city. 469 A.2d at 1052.

Following the court's decision, Sprague contacted Robert C. Daniels, Esquire, whose practice is largely in the personal injury field, and requested that he and his law firm undertake the pending litigation on behalf of the union. No proceedings relating to the substantive issues in the lawsuit had begun in view of the pendency of the disqualification issue. By letter to Stout dated February 27, 1984, Daniels agreed to represent District Council 33 with regard to its rights under the contract extending from July 1, 1982, through June 30, 1984, in exchange for a $75,000 retainer fee. *See* Plaintiff's Motion for Leave to File Amended Complaint, *District Council 33, et al. v. Daniels, et al.* (hereinafter, "Plf's Motion to Amend, *D.C. 33 v. Daniels*") at Exh. E, attached to Exh. A. Although the letter specifically excluded representation in connection with claims against the city for contract periods before July 1, 1982, it is unclear whether the initial agreement between Daniels and Stout for the $75,000 retainer fee was intended to cover any appeals of the original action. (In an affidavit by Daniels in a lawsuit recently filed against him by the union, he maintains that the initial fee agreement only contemplated representation in the preliminary injunction proceeding then pending before the court of common pleas. *See* Defendant's Answers to Plaintiffs' First Set of Interrogatories, *District Council 33, et al. v. Daniels, et al,* (hereinafter, "Dft's Answers to Interrog., *D.C. 33 v. Daniels*"), Exh. D at 2–3).

Daniels obtained an overwhelmingly favorable result for the union. The Honorable Lawrence Prattis, sitting as a chancellor in equity, granted the union's motion for a preliminary injunction on April 27, 1984, and entered findings of fact and conclusions of law which supported the union's position concerning the issue of the city's liability. *See id.* at Exh. C, attached to Exh. D. Although the judge ordered on May 3, 1984, that the city's monthly payments under the collective bargaining agreement be increased retroactively effective January of 1983, the precise amount of damages and the city's monthly financial obligation to the union as set forth in the contract had yet to be determined. During the next twelve months, Daniels supervised the process of certifying medical bills for payment by the city and prepared the case for trial. Still contesting its liability, the city followed through with its original intentions to litigate. On April 4, 1985, following a hearing before Judge Prattis, the court found in favor of the union, and on April 26, 1985, issued an order awarding the union close to $21 million in damages, subject to credits due the city for payments made following the issuance of the preliminary injunction. *See id.* at Exh. I, attached to Exh. D.

Apparently confident with the strength of the union's position, notwithstanding the city's announced intention to appeal, Sprague appeared before the executive board of District Council 33 on April 9, 1985, and informed it that Judge Prattis' decision "probably makes this union one that will have the richest Health and Welfare Fund in the world." *See* Plf's Motion to Amend, *D.C. 33 v. Daniels*, Exh. F at 2, attached to Exh. A.

Daniels insisted on more money for continued representation. Two months earlier, at Daniels' request, Sprague had arranged with Stout for the union to pay Daniels an additional $125,000 in connection with the litigation. *See* Dft's Answers to Interrog., *D.C. 33 v. Daniels*, Exh. D at 11–13; N.T. 9/14/89 at 138. On April 22, 1985, the city paid the union's Health and Welfare Fund $8.5 million on account of the payments ordered by Judge Prattis. Two days later, the Fund paid $125,000 to Daniels toward

the fee arranged in February. Despite the tremendous award in its favor, Stout informed Sprague that the union could not afford additional lump sum payments to Daniels. N.T. 9/14/89 at 139–40. Inexplicably, Stout, Sprague, and Daniels arranged for the union to pay Daniels a 25 percent contingent fee which was to apply to all sums recovered in excess of $14 million in the original and companion cases. The fee agreement is contained in a letter from Daniels to Stout dated May 20, 1985, executed by Stout on May 24, 1985. *See* Plf's Motion to Amend, *D.C. 33 v. Daniels* at Exh. G, attached to Exh. A.[2] Neither Daniels nor Sprague sought approval of this arrangement from any official union source other than Stout. *See* N.T. 9/14/89 at 140–41; Dft's Answers to Interrog., *D.C. 33 v. Daniels* at 32–35, Exh. D at 16. It appears that Stout unilaterally authorized the agreement on behalf of the union. Counsel for the defendant maintains that this was not at all unusual since "virtually every action that Earl Stout took from the time he took office until the day he left office was without seeking prior approval from any board. It was the way that union operated." N.T. 9/7/89 at 17.

When the city appealed, Daniels took only one exception to Judge Prattis' factual findings, claiming that the judge erred in calculating damages: the proper amount was close to $27 million, not $21 million. Success on the union's cross-appeal would increase its potential award with respect to all contract years since 1975 to between $80 and $100 million, N.T. 9/14/89 at 145, of which Daniels would get between $16.5 and $21.5 million.

Several months before the final hearing in the original case, Daniels asked Sprague to handle a personal injury case for him on appeal to the Pennsylvania Supreme Court, *Reilly v. SEPTA*, 330 Pa.Super. 420, 479 A.2d 973 (1984), *aff'd in part, rev'd in part*, 507 Pa. 204, 489 A.2d 1291 (1985), in consideration for $250,000. Daniels had al-

ready obtained a $10 million verdict before Judge Kremer of the Philadelphia Court of Common Pleas. SEPTA appealed to the superior court, claiming, *inter alia*, that Judge Kremer should have recused himself. Although it found no reversible error, the superior court remanded the case to the trial court on the issue of recusal. Upon allocator to the supreme court, Sprague argued the issue of disqualification and won. *See Reilly*, 489 A.2d 1291. The verdict was affirmed in its entirety.

The subsequent financial arrangements between Sprague, Daniels, and Stout in the spring of 1985 are, at best, difficult to comprehend. In June of 1985, one month after Sprague negotiated the union's contingent fee with Daniels, Daniels and Sprague reached an "oral agreement," approved only by Stout, whereby Sprague agreed to relinquish the $250,000 fee owed him by Daniels after the *Reilly* verdict in exchange for a 50 percent interest in Daniels' contingent fee. Neither Daniels, Sprague, nor Stout informed the executive board of the union or the board of trustees of the Health and Welfare Fund of this fee-splitting arrangement.

Following an appeal by the city and cross-appeal by the union to the superior court, in which the court affirmed Judge Prattis' injunctive relief and breach of contract finding, but denied the union's cross-appeal, 354 Pa.Super. 176, 511 A.2d 818 (1986), per order of February 26, 1988, the Pennsylvania Supreme Court affirmed the superior court on the city's appeal, and reversed its decision on the cross-claim. The union's award in the original case was increased to over $27 million. *District Council 33, et al. v. City of Philadelphia*, 517 Pa. 401, 537 A.2d 1367 (1988).

James Sutton replaced Earl Stout as the president of District Council 33 on May 11, 1988. One of Sutton's first "official acts" was to relieve both Sprague and Daniels of their responsibilities with respect to Dis-

---

**2.** When the letter was written, the City had paid the union a total of $13 million. *See* Plf's Motion to Amend, *D.C. 33 v. Daniels* at Exh. G, attached to Exh. A. It is true that much of the money was required to pay health care provid-

ers; nonetheless, the contingent fee agreement was finalized at least two months before the city filed its notice of appeal to the superior court, at a time when the union was regaining its financial strength as a result of Judge Prattis' verdict.

trict Council 33. *See* Gov't Exh. 4; Dft's Answers to Interrog., *D.C. 33 v. Daniels* at Exh. M, attached to Exh. D. Daniels subsequently filed an attorney's charging lien with respect to any recovery by the union stemming from the original contract action as well as the companion cases. *See id.* at Exh. O, attached to Exhibit D. Although the city eventually settled the companion cases for approximately $55 million, *see* Plf's Motion to Amend, *D.C. 33, v. Daniels* at Exh. J, attached to Exh. A, the union has refused to honor the contingent fee agreement.

On May 20, 1988, District Council 33 and the Health and Welfare Fund filed a civil action against Daniels in the Philadelphia Court of Common Pleas following his efforts to attach part of the union's recovery from the city. The union alleged that the contingent fee agreement was improper, unauthorized, and excessive. In April of 1989, after the union had filed a first amended complaint, the Pennsylvania Supreme Court ordered that the case be transferred to the Chester County Court of Common Pleas for expedited proceedings. *See District Council 33, et al. v. Daniels, et al.,* No. 89–03568, Chester County Court of Common Pleas. Howard J. Kaufman, Esquire, an attorney representing the union in its case against Daniels, testified that he first learned of Sprague's 50 percent interest in this fee when Daniels served his answers to plaintiffs' first set of interrogatories on August 8, 1989. N.T. 9/14/89 at 125; *see* Dft's Answers to Interrog., *D.C. 33 v. Daniels* at 42–42(a). Kaufman testified that the trustees of the Health and Welfare Fund were unaware of the fee-split until he brought it to their attention at a board meeting on September 6, 1989. N.T. 9/14/89 at 125. The union moved for leave to file a second amended complaint to add Sprague as a defendant to the action on September 13, 1989.

Stout was officially informed that he was the subject of an FBI investigation resulting from his conduct during his tenure as president of District Council 33 on February 23, 1989, when he received a target letter from the Office of the United States Attorney. N.T. 9/7/89 at 61. In May or June of 1989, the United States Attorney for the Eastern District of Pennsylvania, Michael M. Baylson, called Sprague to inform him that a subpoena was soon to be issued requiring his appearance as a witness before the grand jury in the matter concerning Stout. N.T. 9/7/89 at 23; N.T. 9/14/89 at 47. At that point, Baylson was aware that Sprague represented Stout. N.T. 9/14/89 at 47. Sprague immediately became concerned that the grand jury subpoena was an effort by the government to have him disqualified from the case once an indictment was returned against his client; he and Baylson disagree, however, as to whether he conveyed this suspicion to Baylson during this initial phone conversation. They also disagree about the extent and nature of their discussions following this phone conversation. In any event, it is undisputed that at a subsequent luncheon meeting, Baylson assured Sprague that his grand jury testimony would not be the basis of a motion to disqualify him. N.T. 9/7/89 at 50; Gov't Exh. 20. It appears that the government subpoenaed Sprague to obtain information about the nature of his fee arrangements with the union when he and his law firm represented it as "general counsel" and about Stout's involvement in the setting and payment of these fees. At the luncheon meeting, Sprague and Baylson discussed the possibility that the grand jury testimony could become the product of a stipulation at trial. N.T. 9/7/89 at 58; N.T. 9/14/89 at 59, 80. Baylson informed Sprague that his disqualification might be required on other grounds, in particular, if the government believed that Sprague would need to be a witness for the defense. N.T. 9/14/89; Gov't Exh. 20.

Sprague testified before the grand jury on June 13, 1989. Two months later, the grand jury indicted Stout.

## II. DISCUSSION

### A. *Introduction*

Defendant has characterized the government's efforts in this matter as "deceptive," "fraudulent," and "reprehensible." Defendant relies primarily on the represen-

tation made by Baylson to Sprague that the government would not seek to use the substance of Sprague's grand jury testimony or the fact that he had testified as a means to have him disqualified as Stout's attorney. Defendant maintains that the Assistant United States Attorney handling the case, Seth Weber, was unaware of Baylson's agreement with Sprague, and that he filed the initial motion for a hearing based on the alleged conflict arising from Sprague's grand jury testimony. It was only after Weber learned of the agreement, contends the defendant, that the government fabricated additional grounds upon which to disqualify Sprague.

I do not agree that the government has acted in bad faith. The government's supplemental motion for a hearing regarding a conflict of interest establishes that Sprague's disqualification is required by Rules 1.7, 1.9, and 3.7 of the Pennsylvania Rules of Professional Conduct, 42 Pa.C. S.A., and by former Canon 9 of the Pennsylvania Code of Professional Responsibility, 42 Pa.C.S.A.[3] I find that the government's memoranda and the arguments it presented at both hearings reflect a genuine concern for the Sixth Amendment rights of the defendant and for the integrity of the judicial system.

■ The Sixth Amendment guarantee of effective assistance of counsel includes two correlative rights, the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free from conflict of interest. *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 131 (3d Cir. 1984). I have no doubt that the representation defendant has received and would continue to receive from Sprague and from the members of his firm is comprehensive and capable. Indeed, Sprague is a highly-respected attorney in this community who enjoys a reputation for zealous advocacy. My inquiry, however, cannot end there. The evidence presented by *both* sides of this dispute clearly establishes that Sprague's continued participation in this case poses a substantial threat to the best interests of his client, a threat that the law will not permit me to tolerate.[4]

■ There was a great deal of testimony from Sprague and from Baylson concerning their agreement about the use of Sprague's grand jury testimony. Although the parties disagree about some of the events surrounding the luncheon meeting between Baylson and Sprague, unquestionably Baylson told Sprague that Sprague's grand jury testimony would not be the basis of a disqualification motion. There is also no question, however, that the government did not promise Sprague that there would be no move to disqualify him on other grounds. Baylson made it clear to Sprague that any decision on disqualification would be made by the court, and he made neither prediction nor promise as to what a court might decide. N.T. 9/14/89 at 60, 90–91. The agreement did not incorporate issues arising from Sprague's former position as general counsel to District Council 33 or from the peculiar fee arrangement between Sprague and Daniels, allegedly sanctioned by Stout. It is on the basis of *these* issues, and *not* Sprague's grand jury testimony, that I find his disqualification to be necessary; hence, any remaining controversy surrounding the agreement between Baylson and Sprague

---

**3.** Canon 9 and the entire Pennsylvania Code of Professional Responsibility has been superseded by the Pennsylvania Rules of Professional Conduct, effective April 1, 1988. Nonetheless, Canon 9, which holds that "a lawyer should avoid even the appearance of professional impropriety," remains an integral part of the Rules of Professional Conduct and of the ethical standards of this court. In *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court held that "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the

ethical standards of the profession and that legal proceedings *appear fair to all who observe them," id.* 108 S.Ct. at 1697 (emphasis added); hence, the dictates of Canon 9 survive its supersession. For ease of reference, I will continue to refer to these dictates as "Canon 9."

**4.** The defendant is entitled to a presumption in favor of the counsel of his choice; however, "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat,* 108 S.Ct. at 1700.

is irrelevant to my decision and one I need not resolve. For the sake of clarity, I will discuss the Daniels' fee arrangement and Sprague's union representation separately, although it should become clear that the conflicts inherent in both situations tend to overlap.

### B. *The Daniels' Fee Agreement*

■ The government contends that Stout's alleged approval of a $125,000 increase in Daniels' retainer and subsequent renegotiation of Daniels' fee to include a 25 percent contingency fee in which Sprague had a 50 percent interest were not duly authorized by the appropriate members of the union's board of trustees. The government has stated it will seek to offer into evidence under Fed.R.Evid. 404(b) Stout's involvement in the increased and renegotiated fee, and, in particular, his knowledge or approval of Sprague's half interest in it to show the defendant's knowledge, purpose, and intent. The defendant submits that any such proffered 404(b) material has little probative value, is unduly prejudicial under Fed.R.Evid. 403, will be inadmissible at trial, and cannot form the basis of a motion to disqualify. At this point in the proceedings, any decision regarding the admissibility at trial of alleged 404(b) material is premature. Nonetheless, for the purpose of the government's motion, I will assume that evidence about the Daniels–Sprague fee-split will not be received at trial. Regardless of the admissibility of evidence, Sprague's own explanation about the outstanding allegations against him in the union's case pending in the Chester County Court of Common Pleas shows enough of a conflict between his interests and those of his client that disqualification is required. Moreover, his explanation shows that the need to preserve the integrity of the judicial process compels disqualification.

The union's proposed second amended complaint accuses Sprague of professional negligence, malpractice, and breach of his fiduciary duties to the union in connection with his participation in the allegedly illegal fee-splitting agreement that contemplated what the union has deemed an "excessive" and "clearly unreasonable" fee. *See* Plf's Motion to Amend, *D.C. 33 v. Daniels*, Exh. A at 3–6. There is little doubt that Stout's criminal trial will precede the civil trial in which Sprague may either be added as a defendant or separately sued. In view of the fact that Daniels' contingency fee would entitle him to $17 million [5] in the event that the union is unsuccessful in nullifying its contract with him, Sprague's interest in the outcome of that civil suit is approximately $8.5 million. The propriety of his professional conduct has been questioned. Under such circumstances, Sprague clearly has a substantial personal and financial stake in Stout's acquittal as prohibited by Rule 1.7(b) of the Pennsylvania Rules of Professional Conduct. Stout's acquittal would legitimize Sprague's failure to seek board approval of Daniels' renegotiated fee and his half interest in it, inasmuch as the union asserts in its civil case that Sprague had a duty to disclose this information directly to the board of trustees of the union's Health and Welfare Fund and to obtain its consent. *Id.* at 5–6.

■ Rule 1.7(b) states in pertinent part:
A lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after full disclosure.

Because Rule 1.7(b) includes the directive "shall not," I must conclude that Sprague "reasonably believes" that his representation of Stout will not be adversely affected by his $8.5 million interest in the civil matter pending in Chester County. Quite frankly, I am puzzled that Sprague could make such an assumption. The Sixth

---

5. The union recovered $27 million in the original case and settled the companion cases for $55 million. Of this $82 million award, Daniels' fee would be 25 percent of everything in excess of $14 million, i.e., $17 million.

Amendment guarantees Stout the right to his attorney's undiluted, undivided loyalty not only at trial, but with respect to every aspect of representation including pretrial counseling and assistance in plea bargaining.[6] *See Holloway v. Arkansas*, 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181–82, 55 L.Ed.2d 426 (1978). It strains credulity to believe that Sprague could render faithful, conflict-free pretrial advice to Stout with regard to what plea he should enter when a guilty plea would implicate Sprague in the very impropriety charged by the union in its civil case.

The case of *Commonwealth v. Duffy*, 483 Pa. 170, 394 A.2d 965 (1978), is instructive, if not analogous. There, the Pennsylvania Supreme Court reversed the conviction and ordered a new trial for a defendant who claimed that his attorney had suffered from a conflict of interest at trial. The record established that a prosecution witness accused the attorney of agreeing to accept stolen guns from the defendant as payment for legal services. Although this allegation was never revealed to the jury, both the government and the attorney were aware of it. The court found that the attorney could not have given the defendant conflict-free pretrial advice since he had a personal stake in a judgment of acquittal in order to clear his name and avoid criminal charges. 394 A.2d at 968. The Third Circuit cited *Duffy* with approval in *United States v. Provenzano* 620 F.2d 985, 1005 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), where it affirmed a district court's decision to disqualify a defense attorney based in part on the allegation that the attorney had incorporated one of the allegedly "sham" companies charged in the RICO indictment.

Although Sprague has not been accused of unlawful conduct, as were the attorneys in *Duffy* and *Provenzano*, he has been accused of the type of wrongdoing that could be highly damaging to his professional reputation. As in *Duffy* and *Provenzano*, the truth of the allegations against the defendant's attorney and my ability to keep

them from the jury are irrelevant to my determination. What is critical here is the fact that in light of these allegations, Sprague cannot help but conduct Stout's trial with one eye over his shoulder. For example, there is no way he can give conflict-free advice to Stout as to whether to testify or not, because such testimony could, in fact, be damaging to Sprague's defense in his civil case. *See United States v. Cancilla*, 725 F.2d 867, 870 (2d Cir.1984) (where defense attorney, unknown to the court, the prosecution, or the defendant, had engaged in criminal conduct related to offense for which defendant was charged, court finds representation *per se* ineffective since attorney had reason to fear that guilty plea and cooperation by his client could lead to discovery of attorney's bad acts).

Additionally, as in any criminal trial, it is in Stout's best interests for his attorney to discredit the testimony of government witnesses through vigorous cross-examination. Few witnesses take kindly to being discredited and their resentment does not dissipate quickly. Vigorous cross-examination of the union's board members, in particular any members who are trustees for the union's Health and Welfare Fund, could certainly be contrary to Sprague's best interests were he to contemplate an amicable settlement with the union of his half interest in Daniels' $17 million fee. Because settlement is something that every civil litigant will consider, if not pursue, I conclude that the pendency of the union's state court action interferes with Sprague's ability effectively to cross-examine adverse witnesses as well as his ability to find union members willing to testify on behalf of Stout. *Accord Cancilla*, 725 F.2d at 870 (court finds that attorney's conflict of interest may have caused him to tailor cross-examination to avoid possible danger to himself). It is unlikely that anyone currently affiliated with District Council 33 would cooperate with Sprague since to do so might subject that person to censure from

---

**6.** It makes no difference that a plea of guilty might be the last thing in the world that Stout would consider. The quality of the advice to which he is entitled is in no way affected by how he would react to that advice.

the union, not to mention jeopardize the union's efforts to nullify its contract with Daniels. Sprague's continued participation in this case poses a threat to the defendant's ability effectively to confront witnesses against him as well as to his right to present witnesses in his favor simply because Sprague's interests diverge from those of Stout when even the most obvious and anticipated contingencies are considered.

■ Although the defendant has indicated that he is willing to waive any conflicts of interest arising out of Rule 1.7(b), I must refuse his proffered waiver. "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, ——, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Rule 1.7(b) anticipates waiver "after full disclosure and consultation"; nonetheless, the rule mandates disqualification regardless of waiver where, as here, the attorney's conflict of interest will interfere with his representation. The Supreme Court has held that a trial judge may decline a conflict of interest waiver where he finds the waiver to be ineffectual. *Id.* 108 S.Ct. at 1698 (trial court may reject waiver and refuse counsel of choice where representation may be "detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court.") (quoting *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir.1978)).

The government has identified Sprague, Higgins, Creamer & Sprague as the law firm described in paragraph 37 of count 1 of the indictment which allegedly received payments from the union's Legal Services Fund at Stout's direction in violation of the fund's Declaration of Trust. While one can never be certain how a trial will proceed, I can expect testimony about the conduct of union finances, who gave advice, and where the money went. It is entirely foreseeable that Sprague's name and the name of his law firm will surface repeatedly during the course of the trial, regardless of my ultimate decision concerning the government's proffered 404(b) material. Undoubtedly, union officials and members of its executive boards will constitute key witnesses for the prosecution. I can predict with reasonable assurance that they will criticize Sprague and his law firm in light of the union's pending civil complaint. Testimony which directly or indirectly impugns Sprague's integrity in the eyes of the jury will mean he must argue his own credibility to the jury as he concurrently attempts to defend his client. This result constitutes a disqualifying conflict under Rule 3.7(a) of the Pennsylvania Rules of Professional Conduct, which states that "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness." *See also Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 138 (3d Cir.1984) ("The roles of an advocate and of a witness are inherently inconsistent.").

Rule 3.7(a) applies regardless of whether or not the lawyer is called to the witness stand, inasmuch as an attorney's arguments to the jury may, under certain circumstances, be viewed as unsworn testimony. *See Mannhalt v. Reed*, 847 F.2d 576, 581–82 (9th Cir.) (citing with approval former Disciplinary Rule 5–102(A) of the ABA Model Code of Professional Responsibility, superseded in Pennsylvania by Rule 3.7(a), the court affirms attorney's disqualification where prosecution witness implicated him in wrongdoing before jury, even though attorney never sworn as witness), *cert. denied*, —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988); *United States v. Iorizzo*, 786 F.2d 52, 57 (2d Cir.1986) (court held disqualification proper whether or not attorney took witness stand since his firsthand involvement in matter described by prosecution witness would cause any argument to jury to be viewed as statement of witness as well as advocate). In this case, there is the danger that any efforts by Sprague to resurrect his credibility could be adverse to Stout's best interests if in the

process of removing himself from the spectrum of wrongdoing, Sprague implicates the defendant. *Accord Zepp*, 748 F.2d at 137 (stipulation between government and defense attorney cleared attorney of wrongdoing while it removed any inference of doubt favorable to defendant).

■ In the event that it becomes necessary to explain or refute testimony implicating Sprague or merely describing his knowledge of events charged in the indictment, he would surely constitute the best exculpatory witness on behalf of the defendant. He would then be required under Rule 3.7(a) to withdraw mid-trial as Stout's attorney in order to accomplish what is in his client's best interests.[7] The inordinate disruption, delay, and potential prejudice to the defendant occasioned by that sequence of events requires little discussion. Given the government's contention that Sprague and his law firm were the beneficiaries of some of the unlawful acts with which Stout is charged, my concern that Sprague may be a necessary witness for the defense is genuine and substantial, and not the product of mere speculation.[8]

Finally, removing Sprague from this case is the only appropriate means to enforce the ethical standards articulated in Canon 9 of the Pennsylvania Code of Professional Responsibility. Canon 9 mandates that "a lawyer should avoid even the appearance of professional impropriety." Canon 9 was written "to preserve public confidence in the bar and in the legal process," *United States v. Hobson*, 672 F.2d 825, 828 (11th Cir.), *reh'g denied en banc*, 677 F.2d 117, *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74

L.Ed.2d 166 (1982), and not simply as a protection for litigants. "The requirement that a lawyer avoid even the appearance of impropriety reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby could erode public confidence in the judicial system or the legal profession." *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir.1976). Courts have therefore disqualified attorneys due to the appearance of impropriety even where there was no evidence of actual wrongdoing. *See, e.g., Hobson*, 672 F.2d at 828 (likelihood of public suspicion arising from anticipated testimony that defense attorney was aware of marijuana smuggling scheme for which defendant charged mandated disqualification, even absent proof that attorney was implicated in scheme); *United States v. Miller*, 624 F.2d 1198, 1202 (3d Cir.1980) (tax attorney and his firm disqualified from representing defendant on tax evasion charges where attorney had worked in tax fraud unit of United States Attorney's Office during time that government's case against defendant was prepared because the public "would see little to assure [it]self that [the attorney] had not utilized his position to obtain confidential information or to serve conflicting loyalties.")

■ Lest Canon 9 be interpreted to require that attorneys yield to the concerns of even the most conservative and prudent members of society, the Fifth Circuit has articulated a logical and appropriate standard governing disqualifications under Canon 9. First, "there must be at least a

---

7. The government has stated that it intends to call Sprague as a witness during its case-in-chief, requiring his disqualification under Rule 3.7(a). Although the government has not been entirely clear regarding the matters in which it seeks Sprague's testimony, it appears that the bulk of the anticipated testimony will relate to the various fee arrangements between Sprague's law firm and District Council 33, in particular, Sprague's involvement in Daniels' renegotiated contract. To the extent that any of this proffered testimony would be admissible at trial—and on the basis of the record currently before me, I am unwilling and unprepared to make such a pretrial ruling—it is possible that the

government could nonetheless elicit the evidence it seeks to admit from other, less prejudicial sources, such as the union's treasurer or accountant, or from the language of the written agreements of representation.

8. Under Canon 9 of the Pennsylvania Code of Professional Responsibility, I could not permit Stout to waive the impropriety of Sprague's testifying in his favor at trial if it should become evident that such testimony would be beneficial to his defense. *United States v. Hobson*, 672 F.2d 825, 829 (11th Cir.), *reh'g denied en banc*, 677 F.2d 117, *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *see infra* p. 309.

reasonable possibility that some specifically identifiable impropriety did in fact occur." *Woods*, 537 F.2d at 813. Second, there must be a likelihood of "public suspicion or obloquy" which would outweigh the social interests served by the attorney's continued participation in the case. *Id.* at 813 n. 12. An attorney should not be disqualified unless both prongs of the *Woods* standard are met. *Id.; see also United States v. Snyder*, 707 F.2d 139, 145 (5th Cir.1983); *Hobson*, 672 F.2d at 828.

Applying these principles to the facts before me, I find that the contingent fee arrangement between the union, Sprague, and Daniels creates "at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." Standing alone, Sprague's testimony is telling in its simplicity. He steered the union-city case to Daniels, handled an appeal for Daniels, negotiated a contingent fee with the union for Daniels, and then entered into an "$8.5 million for $250,000" fee-swap with Daniels. Of course, these events did not occur overnight; the usual uncertainties of litigation were hovering somewhere in the wings, and Stout did give the deal his approval. The fact remains, however, that on April 9, 1985, Sprague, appearing before the union's executive board, informed its members that Judge Prattis' decision probably made its Health and Welfare Fund "the richest in the world," and characterized the contract with the city as "a gold mine." *See* Plf's Motion to Amend, *D.C. 33 v. Daniels*, Exh. F at 2, 3, attached to Exh. A. Within months, Sprague was in line for $8.5 million from the gold mine without any notice to or approval from the union's board. Regardless of Stout's acquiescence to this strange fee arrangement, I come up empty-handed in my search for an acceptable reason why an attorney who had represented the union as general counsel for many years, during which time he knew its various funds, and in particular, its Health and Welfare Fund, had struggled financial-

ly, would not approach the appropriate officials in the union and inform them that in exchange for $250,000, Daniels would reduce his contingent fee from 25 percent of an anticipated $66 million to 12.5 percent of the same amount.[9] In light of his appearance at the executive board meeting and the detail with which he explained to the board members the financial ramifications of Judge Prattis' decision, *see id.* at 1–4, Sprague can hardly claim that he was unaware that the board members possessed some degree of authority over and concern about the proceeds of the Health and Welfare Fund. I conclude that even if Sprague is never found to have done anything wrong, his own testimony provides "at least a reasonable possibility" that the "specifically identifiable impropriety" charged in the union's complaint against him "did in fact occur."

To apply the second prong of the *Woods* standard, I must balance the likelihood of public suspicion against the social interests served by Sprague's continued representation of the defendant. I do not take lightly the long-standing attorney-client relationship between Sprague and Stout in which Stout has placed his trust and in which he has expressed great confidence. Nonetheless, while Stout's right to be represented by the counsel of his choice is entitled to great deference, this right must yield to the best interests of society where its vindication would undermine public confidence in the integrity of our judicial system.

After much reflection and a careful review of the record, I conclude that the likelihood of public obloquy outweighs the interests of the defendant and society in Sprague's continued participation in this case. District Council 33 and its various entities are the alleged "victims" of the crimes with which Stout has been charged. Sprague represented District Council 33, its local unions, its executive boards, its affiliated employee benefit funds, JFK Hospital, and the individual union members to

**9.** When Sprague entered into the agreement with Daniels, the union expected to recover between $80 and $100 million from the city arising out of the original litigation and the companion lawsuits. Daniels was entitled to 25 percent of everything exceeding $14 million; thus, he stood to receive *at least* 25 percent of $66 million, or $16.5 million, *see supra* p. 301, half of which he was willing to pay to Sprague for $250,000.

varying degrees from 1979 to 1988. In effect, he represented the union as general counsel during the period of time when Stout is accused of "victimizing" it. Aside from the obvious concerns relating to Sprague's ongoing duty of confidentiality to his former client, which will be addressed *infra* at 309–12, an ordinary layperson would find it both troublesome and reproachful if I were to condone the representation of the alleged "victimizer" by the attorney who, little more than a year ago, enjoyed the status and financial rewards associated with his position as trusted advisor to the purported "victim." Furthermore, the public is aware of the union's pending allegations against Sprague and its characterization of his actions with regard to Daniels' contingent fee agreement. It would not only arouse public suspicion, but would shock the public's collective notion of justice if I were to permit an attorney who has been accused of wrongdoing by a former client in a matter related to the crimes with which his current client has been charged to defend the current client at his criminal trial.[10] Society's sense of unfairness undoubtedly would extend not only to the union as the former client, but also to the defendant, who stands to suffer the most from any hostility and ill will that might be directed against Sprague. This is precisely the type of ethical problem Canon 9 was designed to prevent. *See Snyder,* 707 F.2d at 146; *Hobson,* 672 F.2d at 829. It is also the type of ethical problem that cannot be the subject of a waiver by the defendant. Because Canon 9 governs society's perception of the bar and the judicial system rather than the attorney's effective representation of his client, Stout may not waive Sprague's disqualification under Canon 9. *Snyder,* 707 F.2d at 146.

## C. *Sprague's Prior Representation of District Council 33*

■ An attorney's duty of loyalty and confidentiality to his clients continues even after the termination of the attorney-client relationship. It does not end until the former client releases the attorney from that duty or waives any interest in the continued protection of privileged communications. This well-known principle is contained in Rule 1.9 of the Pennsylvania Rules of Professional Conduct, which states in pertinent part:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents ...

or

(b) use information relating to the representation to the disadvantage of the former client except ... when the information has become generally known.

■ It is undisputed that Sprague served as the union's principal attorney between 1983 and 1988, *see* Gov't Exhs. 21, 22. It seems obvious that the defendant's interests are "materially adverse" to the interests of the union. General counsel for the union, Deborah R. Willig, Esquire, testified that the union has refused to waive the attorney-client privilege and any conflicts of interest in this matter. N.T. 9/14/89 at 108–110.[11] The fact that

---

**10.** It is certainly worth noting that the "public" in this case includes the thousands of members of District Council 33. One can argue, therefore, that apart from its interest in maintaining the integrity of the legal system, the "public" has a direct interest in ensuring that the man who is accused of stealing almost one million dollars from hard-earned union funds is not represented at his criminal trial by the attorney whom it has charged with unethical conduct and breach of fiduciary duty with regard to millions more.

**11.** Defendant asserts that the minutes from the executive board meeting of the Health and Wel-

fare Fund reflect that the board moved not to waive the attorney-client privilege in order to prevent Sprague from testifying at trial and not because it wanted to preclude him from representing Stout. In fact, the minutes from the meeting state as follows:

Richard Sprague has acquired confidential and detailed knowledge of District Council 33. District Council 33 has the right to exercise a privilege with respect to the detailed information he has concerning District Council 33. If you do not protect that privilege, Richard

Sprague may not have acted autonomously, only handling legal matters that were assigned to him by Stout, *see* N.T. 9/7/89 at 44, does not mitigate his duty of confidentiality to the individual union members and entities whom he represented. The union's attorney-client privilege did not become the sole possession of Stout simply because he served as the clearinghouse for the union's legal work or because in Sprague's mind, Stout was actually his client. *See* N.T. 9/14/89 at 20 ("I equate each of these [union] entities with Mr. Stout."). Sprague continues to owe a duty of loyalty to the members of District Council 33, his former client.[12] The law charges Sprague "with the virtually unrebuttable presumption that he has received confidential information" from this client. *Cox v. American Cast Iron Pipe Co.*, 847 F.2d 725, 729 (11th Cir.1988). This presumption is automatically imputed to the members of his law firm. *Id.* at 729-30.

■ Stout maintains that disqualification under Rule 1.9 is unwarranted even if

> Sprague will be called as a witness in the ongoing litigation with respect to Earl Stout. To protect the privilege, to keep Richard Sprague off the witness stand and keep that information in the privacy of the union, a Motion should be passed that District Council does not waive this privilege.

Minutes, Executive Board Meeting of the Health and Welfare Fund, September 11, 1989, at p. 9. I find that while the board may have been motivated in part by a desire "to keep Richard Sprague off the witness stand," it also acted to keep confidential communications "in the privacy of the union," a legitimate objective unrelated to the issue of whether Sprague testifies or not.

Defendant maintains that the minutes do not state whether the motion not to waive the privilege was carried or defeated. Additionally, defendant challenges Willig's testimony that the board of directors of J.F.K. Hospital and the executive board of District Council 33 passed similar motions. Although the minutes do not reflect a final vote on the motion, I credit Willig's testimony that the executive board of the Health and Welfare Fund as well as the board of directors of J.F.K. Hospital and the executive board of District Council 33 voted not to waive the union's attorney-client privilege. *See* N.T. 9/14/89 at 108-10.

**12.** By filing suit against Daniels and then attempting to add Sprague as a defendant, the union has waived its right to keep confidential attorney-client communications relevant to the claims raised in its lawsuit. *See* Rules Prof.

confidential communications were exchanged because the matters in which Sprague represented District Council 33 between 1979 and 1988 were not "substantially related" to the crimes with which Stout has been charged. The government has shown some of the various matters in which Sprague and his law firm were called upon to represent a union entity or individual union member in an effort to satisfy the substantial relationship test. *See* N.T. 9/7/89 at 37-47; N.T. 9/14/89 2-20; Gov't Exhs. 1-3, 5-19, 21-22. In light of the "unrebuttable presumption" of receipt of confidential communications, it would appear that the burden shifts to the defendant to *disprove* substantial relationship once the government shows it is entitled to that presumption. Nonetheless, regardless of which party actually possessed the burden of proof, I find that, with one exception, the record fails to establish that the charges pending against Stout are substantially related to the matters in which Sprague and his law firm represented District Council 33.[13] The "one exception" is

Conduct 1.6(c)(3), 42 Pa.C.S.A. Communications made to Sprague in connection with his representation of union members and union entities in matters unrelated to the union's allegations against him remain fully protected by the attorney-client privilege unless confidentiality has been otherwise waived.

**13.** I am aware of the hardship that both parties face in attempting either to prove or disprove that matters are substantially related. On the one hand, the government will be unwilling to reveal prosecution strategy, but may find that it must do so in order to show that its case against the defendant is substantially related to the defense attorney's prior representation of government witnesses. On the other hand, the defense attorney owes a continuing duty of confidentiality to his former client, but may discover that the only way he can convince the court that his prior representation is not related to the case at bar is to violate that confidence. It is therefore not surprising that the cases in which disqualification is accomplished under Rule 1.9(a) tend to involve facts whereby the defendant's attorney previously defended a key government witness against charges stemming from the same criminal scheme in which the defendant is to be tried. Under those circumstances, a substantial relationship becomes self-evident. *See, e.g., United States v. James,* 708 F.2d 40, 45 (2d Cir.1983); *United States v. Cheshire,* 707 F.Supp. 235, 239 (M.D.La.1989).

Sprague's representation of various union affiliates, including J.F.K. Hospital and C.I.T.I. Wide Health Services, in 1987 and 1988 in connection with grand jury subpoenas for records during the government's investigation of Stout. *See* N.T. 9/7/89 at 42–43; N.T. 9/14/89 at 31–32. With respect to that representation, however, it appears that Sprague communicated solely with Stout, and that the services he performed concerned primarily the transmission of documents. *See* N.T. 9/14/89 at 32. Although the trial could prove otherwise, I am satisfied that at this stage in the proceedings, there is no evidence that Sprague's prior representation of District Council 33 presents either an actual conflict or a serious potential for conflict under Rule 1.9(a). The problem, however, lies in Rule 1.9(b) and Rule 1.7(b).

Rule 1.9(b) prohibits an attorney from using information obtained in the course of a prior representation to the detriment of a former client unless that information is not protected by the attorney-client privilege. Rule 1.7(b) requires an attorney to withdraw from a case if his representation of a current client will be adversely affected by his continuing duty of loyalty to a former client. There is no question that Sprague's continued participation in this case poses a substantial threat to the defendant's right to a fair trial because of the serious possibility that his cross-examination of government witnesses will be limited by the constraints imposed by Rules 1.9(b) and 1.7(b). In *United States Ex Rel. Stewart on Behalf of Tineo v. Kelly*, 870 F.2d 854 (2d Cir. 1989), the Second Circuit reversed a district court's decision granting *habeas corpus* relief under 28 U.S.C. § 2254 to the defendant, Tineo, based on the deprivation of his Sixth Amendment right to counsel. The court held that the trial judge had not abused his discretion in disqualifying the defendant's counsel of choice when it was discovered that counsel had previously represented a key government witness, a confidential informant, in an unrelated matter. The attorney was willing to limit his cross-examination of the informant to the information contained in his rap sheet, material to which he would have been entitled even if there had been no previous attorney-client relationship. *Id.* at 855. The court rejected the proffered compromise as unacceptable professional conduct. "[A]n attorney should never offer to be less thorough or diligent in the interest of his client." *Id.* at 857. The court held that "[t]here was no guarantee that Tineo's interests could be served without vigorous cross-examination of the informant in a manner wholly inconsistent with the informant's interests." *Id.* To permit such cross-examination would clearly violate Pennsylvania's Rule 1.9(b). On the other hand, "[t]o limit cross-examination of the informant to his rap sheet may have prejudiced Tineo, had more searching inquiries been necessary for complete evaluation of the testimony against Tineo." *Id.* This type of prejudice is forbidden by Pennsylvania's Rule 1.7(b). Notably, the court found that disqualification was appropriate pursuant to the Supreme Court's recent decision in *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140 (1988), even absent certainty that any of these hypothetical conflicts would arise at trial, in light of its determination that "a serious *potential* conflict of interest exists." *Kelly*, 870 F.2d at 857 (emphasis added).

Similarly, there is no guarantee that for impeachment purposes, competent cross-examination of union members testifying for the government will not require Sprague to delve into matters protected by the attorney-client privilege. To limit his cross-examination of these witnesses to information not covered by the privilege would violate the rights of the defendant and the duty he owes him under Rule 1.7(b). To ignore the proscriptions of Rule 1.9(b) would contravene his on-going obligations to his former clients. It is certainly significant that the District Council 33 Executive Board, the Health and Welfare Board, and the board of directors of JFK Hospital voted not to waive the attorney-client privilege or any conflicts of interest stemming from Sprague's prior representation of the union and these entities. *See* N.T. 9/14/89 at 108–110.

The Pennsylvania Rules of Professional Conduct direct the bar and the judiciary to avoid situations in which a division of loyalties will create an actual conflict of interest. The Supreme Court's decision in *Wheat* permits me the discretion to act before an actual conflict of interest surfaces at trial, when the likelihood of prejudice to the defendant is particularly high. I therefore conclude that the potential for conflict is significant enough to warrant Sprague's disqualification from the trial as well as from future pretrial proceedings. Because there is a strong appearance of professional impropriety attending Sprague's continued representation of the defendant, Stout may not waive his interests under Rules 1.9(b) and 1.7(b). *See supra* p. 309.

### D. The Defendant's Motion to Disqualify the Office of the United States Attorney

During the pendency of the government's motion to disqualify Sprague, Sprague filed a motion on behalf of the defendant to disqualify the Office of the United States Attorney of the Eastern District of Pennsylvania ("OUSA") from prosecuting Stout on the ground that the United States Attorney, Michael M. Baylson, voluntarily recused himself from participation in this case. According to the motion, "[i]f United States Attorney Michael M. Baylson is ethically precluded from participation in this case, then his entire office also should be disqualified." Dft's Motion to Disqualify at 1. Baylson withdrew from the case approximately two weeks before the grand jury returned its indictment against Stout upon discovering that his former law firm continues to represent JFK Hospital in a medical malpractice action which had been brought to the firm when he practiced there.

■■■ There is no suggestion that the malpractice action is even remotely related to the charges pending against Stout. I therefore reject Sprague's contention that the defense will be "required" to call Baylson to testify at trial concerning his former law firm's representation of JFK Hospital.

There is no danger that by prosecuting Stout, the OUSA will adversely affect its representation of its client, the United States of America, since there is no conflict of interest between the OUSA's representation of its client and the representation of JFK Hospital by Baylson's former office. Because the interests of the government are aligned with those of JFK Hospital in this action, the OUSA is not exposed to any of the potential conflicts of interest described in Rule 1.9. Finally, the defendant has not alleged that Baylson engaged in any unlawful or unethical conduct in connection with his work for JFK Hospital. With regard to this prosecution, I have already resolved any questions as to the good faith of the government, and hence as to Baylson, in their favor. *See supra* p. 303. Disqualification of the OUSA is therefore not warranted under Canon 9.

In sum, Sprague's assertion that Baylson "is ethically precluded from participation in this case" is erroneous. Baylson simply exercised his discretion to withdraw from Stout's prosecution voluntarily; he was neither "ethically" nor "legally" disqualified. It does not follow that every member of his office must similarly recuse themselves. Sprague's efforts to draw a parallel between the totality of his union representation and the limited representation of JFK Hospital by Baylson's former firm, and the relevance of each to this prosecution, is, at best, unfortunate. Sprague's motion demonstrates the extent to which he and the members of his law firm have trivialized and ignored the serious threat that their continued participation in this case poses to the public's perception of our legal system and to the defendant's right to his attorney's undivided loyalty. Although I credit every attorney who appears before me with the presumption that pleadings and motions are filed in good faith, I read this motion as little more than an example of that which is required to rebut that presumption. Defendant's motion will be denied.

### III. CONCLUSION

■■■ Faced with actual conflicts of interest between Sprague and the defen-

dant, the serious potential for conflicts of interest between Sprague and the defendant and between Sprague and the union, the union's decision to preserve its rights under the attorney-client privilege, and the risk of eroding the public's confidence in the bar and the judicial process, I must exercise my supervisory authority over the members of the bar and order Sprague and his law firm[14] to withdraw from this case.[15] As there is no ethical or legal basis upon which to challenge the prosecution of Stout by the United States Attorney's Office of the Eastern District of Pennsylvania, I will refuse the defendant's motion to order its disqualification.

An order follows.

## ORDER

AND NOW, this 11th day of October, 1989, it is hereby ordered:

1. The government's motion to disqualify Richard A. Sprague, Esquire, and the law firm of Sprague, Higgins, Creamer & Sprague from participation in this case is granted. Within ten (10) days of the date this order is filed, Sprague shall withdraw from this case and new counsel for the defendant shall enter his/her appearance. Sprague shall have an additional ten (10) days to turn over the defendant's file to his new counsel. New counsel shall have ten (10) days after receiving the file to file any additional motions that may be necessary on the defendant's behalf.

2. Defendant William C. Stout's motion to intervene in the government's motion to disqualify is denied.

3. Defendant Earl Stout's motion to disqualify the Office of the United States

Attorney of the Eastern District of Pennsylvania from prosecuting this case is denied.

---

**14.** Although it is possible that some members of Sprague's law firm were not involved in any of the activities giving rise to the actual and potential conflicts of interest necessitating Sprague's removal from this case, Rule 1.10 of the Pennsylvania Rules of Professional Conduct imputes Sprague's disqualification to every attorney associated with his law firm.

**15.** The defendant William C. Stout seeks leave to intervene in the government's motion to disqualify Sprague as counsel for co-defendant Earl Stout. William Stout contends that he has standing to challenge the government's motion on the ground that as an alleged co-conspirator

of Earl Stout, he has an interest in Earl Stout's acquittal, the likelihood of which may be adversely affected by Sprague's disqualification. Although I have serious doubts that one defendant may assert a viable interest in the vindication of a co-defendant's Sixth Amendment rights, I need not reach that issue because I conclude that in any event, the interests of Earl Stout and the public-at-large in Sprague's disqualification outweigh any right that William Stout may possess in Sprague's continued participation in this case. I will therefore refuse his motion.